## KEVIN F. MACMILLAN ET AL. *v.* HARRISON SCOTT HIGGINS ET AL.
### (AC 22390)

Lavery, C. J., and Schaller and Hennessy, Js.

Argued January 9—officially released April 15, 2003

*Kevin F. MacMillan,* pro se, the appellant-appellee (named plaintiff).

*Eric D. Grayson,* for the appellees-cross appellants (named defendant et al.).

*Opinion*

LAVERY, C. J. The plaintiff Kevin F. MacMillan[1] appeals, and the defendants Harrison Scott Higgins and

---

[1] MacMillan Associates, the other plaintiff, was the business name sometimes used by Kevin F. MacMillan. In this opinion, when we refer to the plaintiff, it is to Kevin F. MacMillan. We note that the plaintiff was represented by counsel until July 27, 1998, when the trial court granted a motion to withdraw filed by the plaintiff's attorney. The plaintiff proceeded pro se during the remainder of the proceedings.

Linda Park Higgins[2] cross appeal, from the judgment of the trial court, adopting the findings and recommendations of the attorney trial referee (referee) in this action to foreclose a mechanic's lien. The plaintiff claims that the court improperly accepted the findings of the referee (1) that the defendants did not act in bad faith during their dealings with the plaintiff and (2) that the contract between the parties was not in practical compliance with General Statutes § 20-418 et seq., the Home Improvement Act (act). The plaintiff also argues, contrary to the recommendation of the referee, that our legislature did not intend to provide to the defendants, whose agent drafted the contract, the protection of the act. In their cross appeal, the defendants challenge the findings and recommendations of the referee that they (1) did not overpay the plaintiff, (2) were not entitled to an award for costs to complete the contract and (3) were not entitled to an award of attorney's fees and punitive damages under General Statutes § 42-110a et seq., the Connecticut Unfair Trade Practices Act (CUTPA). We affirm the judgment of the trial court.

The record discloses the following facts and procedural history. In December, 1991, the defendants solicited the plaintiff, a New Hampshire general contractor, for a construction job. The defendants hired the plaintiff to perform certain improvements to their home in Greenwich. On February 21, 1992, the parties entered into a written contract.[3] The plaintiff had started work on the defendants' house on January 20, 1992, and hired

---

[2] In the complaint, the plaintiff named Harrison Scott Higgins, Linda Park Higgins and Michael Meadow, doing business as Paper Pro, as defendants. Michael Meadow, doing business as Paper Pro, was defaulted for failing to plead and is not a party to this appeal. We therefore refer in this opinion to the Higginses as the defendants.

[3] The parties used the 1987 edition of the American Institute of Architects form contract entitled "Standard Form of Agreement Between Owner and Contractor." The contract adopted by reference the 1987 edition of the form entitled "General Conditions of the Contract for Construction."

various subcontractors.[4] Difficulties at the construction site occurred, and the plaintiff, under protest, prepared various change orders[5] and performed additional work, for which he received additional compensation. The relationship between the parties continued to deteriorate and on August 7, 1992, the plaintiff's employment was terminated by the defendants.

The plaintiff filed an action against the defendants, alleging that he was owed $45,214.12 for work completed pursuant to the contract. The plaintiff also sought to foreclose on a mechanic's lien that had been placed on the defendants' property.[6] The defendants filed an answer, denying the plaintiff's claims, alleged several special defenses and filed a counterclaim alleging that the plaintiff was paid for work that he did not complete and that he violated CUTPA.

The matter was referred to the referee pursuant to General Statutes (Rev. to 1991) § 52-434 (a)[7] and Practice Book § 19-2.[8] The referee heard evidence on June

[4] The defendants gave the plaintiff a draft of the contract, dated January 16, 1992. It was not signed by the defendants.

[5] Section 7.2.1 of the general conditions of the contract states: "A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor, and Architect stating their agreement upon all of the following: .1 a change in the work; .2 the amount of the adjustment in the Contract Sum, if any; and .3 the extent of the adjustment in the Contract Time, if any."

[6] A bond was substituted for the mechanic's lien in July, 1998.

[7] General Statutes (Rev. to 1991) § 52-434 (a) (4) provides in relevant part: "In addition to the judge trial referees who are appointed pursuant to subdivision (1), (2) or (3) of this subsection, the chief justice may appoint, from qualified members of the bar of the state, who are electors and residents of this state, as many state referees as he may from time to time deem advisable or necessary. . . ."

[8] Practice Book § 19-2 provides: "The court or any judge thereof may send to a committee for a finding of facts any case wherein the parties are not, as a matter of right, entitled to a jury trial. A committee shall not be appointed without the consent of all parties appearing, unless the court, after a hearing upon motion for appointment of a committee, is of the opinion that the questions involved are such as clearly ought to be sent to a committee."

10 and 11, 1998, at which time the parties stipulated that the plaintiff's work on the defendants' home was controlled by the act. Additionally, they agreed[9] that the contract did not conform to the act's mandatory requirements, as set forth in General Statutes § 20-249 (a).[10] Specifically, the contract did not contain a notice of the defendants' three day cancellation right, as required by the act.[11] Finally, the parties agreed that the plaintiff could not prevail on his claims absent a

[9] On June 11, 1998, the following colloquy occurred between the referee and the parties:

"[Referee]: Do I understand, then, that there is a stipulation in effect that paragraph six, which says, contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740 [of the General Statutes, the Home Solicitation Sales Act, General Statutes § 42-134a et seq.], that there is no such notice of cancellation rights?

"[Plaintiff's Counsel]: That's correct.

"[Referee]: And you both agree that that's right?

"[Defendants' Counsel]: I definitely agree."

[10] General Statutes § 20-429 (a) provides in relevant part: "No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740 [General Statutes § 42-135a], (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. . . ."

[11] General Statutes § 42-135a provides in relevant part: "No agreement of the buyer in a home solicitation sale shall be effective if it is not signed and dated by the buyer or if the seller shall:

"(1) Fail to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its execution, which contract shall be in the same language as that principally used in the oral sales presentation and which shall show the date of the transaction and shall contain the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer, or on the front page of the receipt if a contract is not used, and in boldface type of a minimum size of ten points, a statement in substantially the following form: YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT."

finding that the defendants acted in bad faith.[12]

After hearing evidence, the referee issued a report on November 24, 1998, finding that the defendants did not act in bad faith.[13] The court filed its memorandum of decision on September 7, 1999. Prior to accepting the report, it remanded the matter to the referee with instructions to consider three issues. First, the referee was instructed to consider whether *Wright Bros. Builders, Inc.* v. *Dowling*, 247 Conn. 218, 720 A.2d 235 (1998), in which our Supreme Court held that practical and not perfect compliance was all that was required under the act, applied to the facts of the present case. Second, the court requested that the referee determine the significance, if any, of the fact that the contract was not prepared by the plaintiff, but by the defendants and their agents. Third, the referee was asked to determine the significance, if any, of the fact that the defendants and their attorney were familiar and experienced with the provisions of the act, as demonstrated by their involvement in *Meadows* v. *Higgins*, 249 Conn. 155, 733 A.2d 172 (1999). In addition to addressing those issues, the referee also was also instructed to complete the trial regarding the defendants' counterclaim.

On April 28, 2000, the referee issued a report addressing the three issues raised by the court. Initially, he concluded that although *Wright Bros. Builders, Inc.* v. *Dowling,* supra, 247 Conn. 218, was applicable to the present case, because of the parties' stipulation that

[12] The following colloquy occurred between the referee and counsel:

"[Referee]: If there's no finding of bad faith, that's the other thing, but that's dispositive of [the plaintiff's] claim. Am I right about that?

"[Plaintiff's Counsel]: Yeah. If there is bad faith shown, then he's got a claim.

"[Defendant's Counsel]: If there's no bad faith, it's dispositive.

"[Plaintiff's Counsel]: Yes."

[13] The plaintiff filed a motion to correct the report of the referee and an exception to the referee's report. The referee reviewed both motions and affirmed his findings.

the contract did not conform to the requirements of the act, the only issue was whether the defendants had acted in bad faith. The referee then stated that although he had considered the fact that the defendants and their agents had prepared the contract, and that the preparation by the defendants' attorney "fell far short in terms of quality," he did not conclude that the preparation "was done intentionally and in bad faith." In addressing the third question, the referee considered the fact that the defendants and their attorney were "experienced, knowledgeable, and competent in dealing with matters involving [the act]," as demonstrated by their participation in the *Meadows* case." The referee concluded, however, that he was unable to make a factual determination that the defendants' attorney intentionally had prepared the contract to deceive the plaintiff or had acted fraudulently or in bad faith.[14]

The referee then heard evidence on the defendants' counterclaim. The defendants alleged that they were entitled to a return of the money that they had paid to the plaintiff for work that was not completed, as well as compensation for additional funds in the amount of $164,350 that they had expended to complete the work on the house. Additionally, the defendants alleged that the plaintiff had violated CUTPA and that they were, therefore, entitled to an award of attorney's fees and punitive damages. On February 1, 2000, the referee issued a supplemental report detailing his findings of fact and recommendations with respect to the defendants' counterclaim. He found that the defendants did not overpay the plaintiff and that they were not entitled to compensation for the $164,350 they spent to complete the construction on their house. Additionally, the referee concluded that the defendants did not suffer an ascertainable loss of money as specified by CUTPA,

---

[14] The plaintiff, on May 14, 2000, filed an objection to the referee's report. The referee reviewed the motion and affirmed his findings.

and, therefore, declined to award attorney's fees or punitive damages.

The court then issued a supplemental memorandum of decision on August 28, 2001. After reviewing the three reports submitted by the referee, the court adopted the referee's findings and recommendation, and rendered judgment in favor of the defendants with respect to the complaint and in favor of the plaintiff as to the defendants' counterclaim. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff raises three claims on appeal. Specifically, he argues that the court improperly accepted the finding of the referee (1) that there was no bad faith on the part of the defendants in their dealings with him and (2) that the contract was not in practical compliance with the act. The plaintiff also argues, contrary to the recommendation of the referee, that our legislature did not intend to provide to the defendants, whose agent drafted the contract, the protection of the act. We disagree.

At the outset, we set forth the standard of review with respect to the factual findings and recommendations made by a referee. "A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. . . . This court has articulated that attorney trial referees and factfinders share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . .

"The factual findings of a [trial referee] on any issue are reversible only if they are clearly erroneous. . . .

[A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Elgar* v. *Elgar*, 238 Conn. 839, 848–49, 679 A.2d 937 (1996); *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 345, 805 A.2d 735, cert. denied, 262 Conn. 992, 812 A.2d 864 (2002).

"Although it is true that when the trial court reviews the attorney trial referee's report the trial court may not retry the case and pass on the credibility of the witnesses, the trial court must review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report. It is also true that the trial court cannot accept an attorney trial referee's report containing legal conclusions for which there are no subordinate facts. . . . If the attorney referee's ruling was not legally and logically correct, the trial court may reject the report." (Citation omitted; internal quotation marks omitted.) *Killion* v. *Davis*, 257 Conn. 98, 102–103, 776 A.2d 456 (2001). With those principles in mind, we now address the plaintiff's claims.

A

The plaintiff first claims that the court improperly accepted the factual finding of the referee that the defendants did not act in bad faith. Specifically, the plaintiff argues that the existence of bad faith was demonstrated by evidence that the defendants had forced him to sign a new contract in February, 1992, which included additional requirements, after he had begun work in January, 1992, and by evidence that the defen-

dants' attorney, who was experienced with the mandatory requirements of the act, had drafted the contract and that the defendants previously had attempted to use the act to deny payment to a contractor in *Meadows* v. *Higgins*, supra, 249 Conn. 155.

Our Supreme Court, in interpreting the act, has established the general rule that a contractor who fails to comply with the act is prohibited from recovery under either a breach of contract claim or quasi-contractual methods of recovery, such as unjust enrichment or quantum meruit. *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 350, 576 A.2d 149 (1990); *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 340, 576 A.2d 464 (1990); *Barrett Builders* v. *Miller*, 215 Conn. 316, 322–23, 576 A.2d 455 (1990). The court, however, in *Habetz* v. *Condon*, 224 Conn. 231, 237, 618 A.2d 501 (1992), held that "[p]roof of bad faith . . . serves to preclude the homeowner from hiding behind the protection of the act." The court also stated that the existence of bad faith is a question of fact. Id., 237 n.11. "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) Id., 237.

In his report, the referee noted that the contract drafted by the defendants' attorney "fell far short in terms of quality, but . . . [he could not conclude that] it was done intentionally and in bad faith." The referee stated that he could not find that the defendants' attorney had drafted the contract to "trick the plaintiff or participate in any fraud or bad faith activity in connection with this matter." In its memorandum of decision, the court stated that "[t]he plaintiff presented a plausi-

ble argument by bringing to light that [the] defendants and their former attorney, described by the . . . referee as knowledgeable about [the act], prepared the contract and had both been involved in *Meadows* v. *Higgins*, supra, 249 Conn. 155. If left to its own devices, the court might well find grounds for the bad faith exception. *However, this issue must be seen in the context of the attorney trial referee program where a court does not have a free hand to substitute its judgment as to the facts for the judgment of the referee."* (Emphasis added.)

The question before this court is not whether, if faced with the same set of facts, we would reach the same finding as did the referee, but whether the referee's finding of an absence of bad faith was clearly erroneous. Under the limited scope of review that we are afforded, we cannot say that the finding was clearly erroneous.

In his report dated November 24, 1998, the referee stated that he reviewed the evidence presented and observed the demeanor of the witnesses. He concluded that he could not make a factual determination that the defendants had acted in bad faith, even though there was evidence of negligence, carelessness and practices that did not conform to business standards. The referee opined that under the facts and circumstances, to make a finding of bad faith, the plaintiff was required to prove that the defendants had acted with "a dishonest purpose and intended to mislead or deceive the plaintiff." He was unable to make such a finding. The referee also reviewed all the evidence on the issue of bad faith after the court had remanded the matter to him with instructions to address the three questions raised by the court. In his report, dated April 26, 2000, the referee again concluded that he could not make the factual determination that the defendants had acted in bad faith.

We also note that the fact that the defendants, through their agent, drafted the contract does not mandate a finding of bad faith. In *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 243, 618 A.2d 506 (1992), the agents of the homeowners drafted the contract that failed to contain the cancellation clause required by the act. Our Supreme Court, in affirming the trial court's rendering of summary judgment, stated that the "fact that the [homeowners] had their architect and New York attorneys draft the contract does not in and of itself indicate bad faith on the part of the defendants. . . . At most, the New York attorneys were negligent in failing to consult Connecticut law and to include the required clause in the contract. An honest mistake does not rise to the level of bad faith." Id., 248–49.

The plaintiff further argues that the bad faith was demonstrated by the fact that the defendants forced him to sign a new contract after he had started work on their home. Our review of the record reveals that the defendants did not sign the January, 1992 form. Moreover, there was testimony from William Philips, the attorney who drafted the contract, that the January, 1992 document simply was a draft used to complete the contract and establish the terms.

We also note that the court instructed the referee specifically to consider the issue and significance, if any, of the fact that the defendants and their agents had demonstrated, through their involvement with the case of *Meadows* v. *Higgins*, supra, 249 Conn. 155, knowledge and familiarity with the provisions of the act. In responding to that instruction, the referee concluded that he could not make a finding that the defendants' attorney, the drafter of the contract, intentionally had prepared it to deceive the plaintiff or had acted fraudulently or in bad faith.

Our review of the record convinces us that the finding of fact made by the referee, i.e., that the plaintiff failed

to prove that the defendants had acted in bad faith, was supported by the subordinate facts and was legally and logically correct. Accordingly, it was not clearly erroneous for the court to accept the referee's finding.

## B

The plaintiff's second argument is that the court improperly accepted the referee's finding that the contract was not in practical compliance with the act. In support of his argument, the plaintiff relies on *Wright Bros. Builders, Inc.* v. *Dowling,* supra, 247 Conn. 218. As stated in part I A, we review that argument under the clearly erroneous standard of review.

In *Wright Bros. Builders, Inc.,* our Supreme Court held that letter perfect compliance with the provisions of the act is not required and that minor technical deviations from the act will not bar the contractor from recovery. Id., 231. The present case, however, is readily distinguishable.

We note that the parties stipulated to the fact that the contract did not comply with provisions of the act. The parties further stipulated that the sole issue before the referee with respect to the plaintiff's claim was whether the defendants had acted in bad faith.[15] Moreover, the facts in the present case are readily distinguishable from those found in *Wright Bros. Builders, Inc.* v. *Dowling,* supra, 247 Conn. 218. In *Wright Bros. Builders, Inc.,* our Supreme Court held that the deviations from the act were highly technical in nature, and consisted of the absence of the cancellation notice in duplicate and the failure to enter certain dates on the cancellation notice that easily could be obtained from a brief review of the contract. Id., 232–33. Those devia-

[15] "[A] formal agreement or stipulation of fact fairly entered into is controlling on the parties and the court is bound to enforce it." *Highgate Condominium Assn.* v. *Watertown Fire District,* 210 Conn. 6, 19 n.6, 553 A.2d 1126 (1989).

tions, furthermore, did not deprive the homeowners of notice of their cancellation rights and, therefore, the purpose of the act was achieved, despite the minor deviations.

By contrast, in the present case there was no cancellation provision. There was the complete absence of one of the explicit requirements of the act. Because the defendants received no notice of their cancellation rights, the purpose of the act cannot be said to have been furthered. Accordingly, we conclude that the court properly accepted the referee's finding that the contract was not in compliance with the act.

## C

The plaintiff finally argues, contrary to the recommendation of the referee, that our legislature did not intend to provide to the defendants, whose agents drafted the contract, the protection of the act. According to the plaintiff, it was, therefore, improper for the court to accept the recommendation.

Prior to addressing the plaintiff's claim, we set forth the applicable standard of review. The plaintiff raises a question of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Jones* v. *Kramer*, 72 Conn. App. 789, 792, 806 A.2d 606, cert. granted in part, 262 Conn. 914, 811 A.2d 1291 (2002); see also *State* v. *Courchesne*, 262 Conn. 537, 577, 816 A.2d 562 (2003) (en banc).

Our Supreme Court, in *Barrett Builders* v. *Miller*, supra, 215 Conn. 316, noted the potential results that could occur with strict enforcement of the act. "We recognize that our decision may lead to a harsh result where a contractor in good faith but in ignorance of the law performs valuable home improvements without complying with [the act]. We are unpersuaded that this deficiency in the statute is within our power to remedy. Clearly, the legislature is entitled, in the first instance, to impose the burden of compliance with the statute on the professional, the contractor, rather than on the nonprofessional, the consumer. Viewing the continued incidence of complaints about home improvement contractors, the legislature could legitimately view as more urgent the need to protect consumers from unscrupulous contractors than the need to protect innocent contractors from manipulative consumers." Id., 326–27. The court also stated that "[t]he legislature, having responded to the plight of consumers overborne by high pressure home improvement salesmanship, ought nonetheless to contemplate the possibility that some inexperienced contractors may encounter homeowners who use [the act] as a sword rather than as a shield. . . . This court cannot, however, supply these forms of recovery absent authorization from the legislature." (Citation omitted.) Id., 328–29.

It is clear that the burden to ensure compliance with the act is on the contractor. See *Wright Bros. Builders, Inc.* v. *Dowling*, supra, 247 Conn. 228. Moreover, in the present case, there was an absence of a factual finding of bad faith on the part of the defendants and a stipulation that the contract between the parties was governed by the act. Accordingly, we conclude that the court properly accepted the referee's recommendation that the defendants were entitled to the protections afforded by the act.

## II

In their cross appeal, the defendants claim that the court improperly accepted the findings of the referee that they (1) did not overpay the plaintiff, (2) were not entitled to an award of costs to complete the contract, and (3) were not entitled to an award of attorney's fees and punitive damages as a result of the plaintiff's violation of CUTPA. As stated in parts I A and B, we examine the referee's findings of fact under the clearly erroneous standard of review. We will address each of the defendants' claims in turn.

### A

The defendants first claim that the court improperly accepted the referee's finding that they did not overpay the plaintiff. Specifically, the defendants contend that the plaintiff was paid for 91 percent of the total value of the contract when only 79 percent of project was completed, resulting in an overpayment of $32,548. We disagree.

The referee found that the total contract price, including the various change orders, was $277,938. At the time his employment was terminated, the plaintiff had been directly paid $225,243, and the subcontractors that he had hired had been paid $45,998, for a total of $271,241.

The defendants argue that the referee improperly included $45,998 that was paid directly to the subcontractors when calculating the amount of work done on the contract by the plaintiff. They also cite the testimony of Bruce Simon, the replacement contractor, that only 79 percent of the work was done when he replaced the plaintiff in August, 1992. The defendants also claim that the plaintiff himself testified that the project was only 75 percent complete when his employment was terminated.

We are unpersuaded by the defendants' claims that the plaintiff was overpaid. Initially, we note that the plaintiff testified that he had hired the various subcontractors to complete the contract he had with the defendants. The referee, therefore, had evidence to conclude that the $45,998 paid directly to the subcontractors by the defendants was, in fact, for the completion of the contract between the plaintiff and the defendants.

Additionally, our review of Simon's testimony indicates that his statement was made while being shown an "Application and Certification for Payment" that was dated June 10, 1992, which indicated that 79 percent of the contract was completed. Moreover, the defendants acknowledged that figure by paying the amount due on June 12, 1992, and did not question the accuracy of the document.

We also note that the plaintiff's statement that he completed 75 percent of the contract, when considered with the entirety of his testimony, reveals that he was testifying about a period of time prior to the termination of his employment. He stated that after working for six and one-half months, he had finished 75 percent of the contract. The plaintiff previously had testified that he started working in January, 1992. The referee, therefore, heard evidence that the plaintiff's work on the contract was 75 percent done at a time prior to the termination of his employment and that he then completed additional work until he was replaced by Simon.

Evidence existed to support the determination that the plaintiff was not overpaid, and we are not left with the firm conviction that an error has been made. We conclude, therefore, that it was not clearly erroneous for the court to accept the referee's findings and recommendations that the defendants did not overpay the plaintiff.

B

The defendants next claim that the court improperly accepted the findings and recommendations that they were not entitled to damages to complete the contract. Specifically, the defendants claim that they expended an additional $164,350 to complete the contract work.

The defendants introduced into evidence a list of payments made to subcontractors from August 21 until November 20, 1992, totaling $186,548.38. The defendants claim that Simon was able to identify certain payments as work completed outside of the scope of the contract between the plaintiff and the defendants. Subtracting those payments, the defendants claim that the remaining $164,350 was paid for work done to complete the contract. Simon, however, was unable to identify which payments, if any, were made to complete the contract work.[16]

In light of the finding that the plaintiff was not overpaid, as well as the testimony of Simon and the absence of any invoices to match the list of payments, it was not clearly erroneous for the referee to find that the expenditure of the $164,350 was not necessary for the completion of the contract.

C

The defendants' last claim is that it was improper for the court to accept the finding of the referee that they were not entitled to an award of attorney's fees and punitive damages as a result of the plaintiff's CUTPA

---

[16] The following colloquy occurred between the referee and Simon:

"[Referee]: Well, now, you've told me what, as best you can recall, what was not part of the contract. That doesn't mean that the items that you didn't talk about are part of the contract. Right?

"[The Witness]: That's correct.

"[Referee]: What you're saying is that they could have been part of the contract or maybe they weren't part of the contract.

"[The Witness]: That's correct."

violation. Specifically, the defendants claim that they are entitled to an award of attorney's fees and costs in the amount of $49,981 and leave to file a motion for additional fees and costs incurred since October 3, 2000. They also sought punitive damages in the amount of $500,000.

The defendants argue, and we agree, that the plaintiff's failure to comply with the act was a per se violation of CUTPA. See General Statutes § 20-427 (c);[17] *A. Secondino & Son, Inc.* v. *LoRicco,* supra, 215 Conn. 343; *Kronberg Bros., Inc.* v. *Steele,* 72 Conn. App. 53, 61, 804 A.2d 239, cert. denied, 262 Conn. 912, 810 A.2d 277 (2002). To recover damages under CUTPA, however, the defendant must prove more than a violation of the statute. "A party seeking to recover damages under CUTPA must meet two threshold requirements. First, he [or she] must establish that the conduct at issue constitutes an unfair or deceptive trade practice. . . . Second, he must present evidence providing the court with a basis for a reasonable estimate of the damages suffered." (Internal quotation marks omitted.) *Reader* v. *Cassarino,* 51 Conn. App. 292, 299, 721 A.2d 911 (1998); see also General Statutes § 42-110g.

In the present case, the referee found that the defendants did not suffer an ascertainable loss. In parts II B and C, we upheld the court's acceptance of the referee's findings that the defendants did not overpay the plaintiff and that the defendants were not obligated to expend the amount claimed to finish the project. There is, therefore, no ascertainable loss shown by the defendants. Consequently, they are precluded from recovery under CUTPA. Accordingly, we conclude that it was not clearly erroneous for the court to accept the finding

---

[17] General Statutes § 20-427 (c) provides in relevant part: "A violation of any of the provisions of this chapter shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b."

that the defendants were not entitled to an award of attorney's fees or punitive damages.

The judgment is affirmed.

In this opinion the other judges concurred.