******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROBINSON, J., with whom ESPINOSA, J., joins, dissenting. I respectfully disagree with the majority's decision in the first certified appeal, SC 19560, to reverse the judgment of the Appellate Court affirming the trial court's judgment in favor of the plaintiff contractor, James E. Burns, Jr., on the ground that the conduct of the defendant homeowner, David Y. Adler,[1] did not fall within the bad faith exception to the statutory bar on the enforcement of contracts that do not comply with the requirements set forth in General Statutes (Rev. to 2007) § 20-429.[2] See *Burns* v. *Adler*, 158 Conn. App. 766, 806, 120 A.3d 555 (2015). Specifically, I disagree with the majority's conclusions, set forth in part II of its opinion, that: (1) the bad faith exception is applicable only when a homeowner enters into an agreement with, or accepts services from, a home improvement contractor knowing that, under the Home Improvement Act (act), General Statutes § 20-418 et seq., the defective contract provides them with an " 'escape hatch' " from payment; and (2) the defendant's repudiation of the contract was the product of a good faith dispute over the goods and services provided by the plaintiff.[3] Instead, I would hold that the bad faith exception, as articulated in *Habetz* v. *Condon*, 224 Conn. 231, 237–40, 618 A.2d 501 (1992), applies when a homeowner has acted in a manner inconsistent with the duty of good faith and fair dealing in the course of his relationship with a contractor, as the trial court properly found to have occurred in the present case. As a result of this conclusion, I would reach the second certified appeal, SC 19561,[4] and conclude that the Appellate Court properly determined that the plaintiff was not entitled to an award of attorney's fees for the foreclosure of his mechanic's lien pursuant to General Statutes § 52-249 (a).[5] *Burns* v. *Adler*, supra, 808. Because I would affirm the judgment of the Appellate Court, I respectfully dissent.

I

I begin by noting my agreement with the background facts and procedural history set forth in the majority opinion. I also agree in limited part with the majority's statement of the standard of review. Specifically, I agree that the issue of whether the plaintiff can invoke the bad faith exception in this case presents a question of law over which our review is plenary, albeit only to the extent that the defendant's claims on appeal require this court to define the contours of that doctrine. See, e.g., *Thompson* v. *Orcutt*, 257 Conn. 301, 308–309, 777 A.2d 670 (2001) (application of equitable doctrine of unclean hands is committed to trial court discretion, but interpretation of that doctrine is question of law subject to plenary review); see also *Walpole Woodwork-*

*ers, Inc.* v. *Manning*, 307 Conn. 582, 588, 57 A.3d 730 (2012) ("[t]he determination of whether an equitable doctrine applies in a particular case is a question of law subject to plenary review"). With respect, however, to the *application* of the bad faith exception, I disagree with the majority's statement of the standard of review to the extent it conflicts with the well established principle that "[w]hether a party has acted in bad faith is a question of fact, subject to review only for clear error." *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007); see *MacMillan* v. *Higgins*, 76 Conn. App. 261, 271–73, 822 A.2d 246, cert. denied, 264 Conn. 907, 826 A.2d 177 (2003); see also *Habetz* v. *Condon*, supra, 224 Conn. 237 n.11. This reflects the fact that a finding of bad faith turns on subordinate considerations such as the relevant actor's motives and intent, which often may only be inferred from circumstantial evidence.[6] See, e.g., *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 250, 618 A.2d 506 (1992).

A

I begin with the majority's analysis of the defendant's claims on appeal, which, notwithstanding footnote 16 of the majority opinion, may be misconstrued as embracing an unduly narrow approach to the bad faith exception. In particular, I wish to emphasize my disagreement with the defendant's position, founded largely on this court's decision in *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 240, that the bad faith exception is applicable only to cases wherein the homeowner entered into an agreement or accepted services from a contractor knowing that the act gave the homeowner an "escape hatch" from payment because the contract was defective under § 20-429 (a). I do not read our articulation of the bad faith exception in *Habetz* as so narrowly circumscribed.

At the outset, I briefly discuss the statutory scheme governing home improvement contract disputes and the history of the bad faith exception in *Habetz*. "Section 20-429 (a) provides that no home improvement contract shall be valid or enforceable against a homeowner unless it contains certain enumerated criteria. The aim of the [act] is to promote understanding on the part of consumers with respect to the terms of home improvement contracts and their right to cancel such contracts so as to allow them to make informed decisions when purchasing home improvement services. . . .

"In *Barrett Builders* v. *Miller*, 215 Conn. 316, 328, 576 A.2d 455 (1990), this court held that a contractor who did not comply with the written contract requirement of the act could not recover in restitution. This result was subsequently modified by one common-law and one statutory exception. First, in *Habetz* v. *Condon*, supra, 224 Conn. 240, this court held that contractors may recover in restitution despite noncompliance with

§ 20-429 (a), when homeowners invoke the protections of the act in bad faith. Subsequently, the legislature enacted No. 93-215, § 1, of the 1993 Public Acts, now codified at § 20-429 (f), which allows recovery of payment for work performed based on the reasonable value of services which were requested by the owner for partial noncompliance with certain requirements of the act when the court determines that it would be inequitable to deny such recovery. Thus, both *Habetz* and § 20-429 (f) provide for recovery in quantum meruit despite a contractor's noncompliance with certain statutory requirements." (Citation omitted; footnotes omitted; internal quotation marks omitted.) *Walpole Woodworkers, Inc.* v. *Manning*, supra, 307 Conn. 586–87; see also footnote 2 of this dissenting opinion.

In formally adopting the bad faith exception,[7] this court emphasized in *Habetz* that its "central element . . . is the recognition that to allow the homeowner who acted in bad faith to repudiate the contract and hide behind the act would be to allow him to benefit from his own wrong, and indeed encourage him to act thusly. Proof of bad faith therefore serves to preclude the homeowner from hiding behind the protection of the act. . . . [W]e need look no further than the maxim that no person may take advantage of his own wrong. . . . This deeply rooted principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar what would otherwise be inequitable reliance on statutes."[8] (Citations omitted; footnote omitted.) *Habetz* v. *Condon*, supra, 224 Conn. 237–38. The court emphasized that the "bad faith exception is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to demands of justice and good conscience. The law does not permit the exercise of a right to repudiate a contract when the exercise of such a right in bad faith would work an injustice. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . To demand this implicit component but do nothing about its absence would be at best incongruous, and, more accurately, grossly unfair. Thus, a contractor, otherwise precluded from recovering moneys owed for his work because of a violation of the act, must be permitted to assert that the homeowner's bad faith precludes him from safely repudiating the contract and hiding behind the act in order to bar the contractor's recovery." (Citations omitted.) Id., 238. Acknowledging that this conclusion potentially "frustrate[s]" the purpose of the act, the court emphasized that the bad faith doctrine is "founded on public policy and contain[s] a strong strain of estoppel," and is intended to "prevent a misbehaving party from invoking the benefits of a statute which is absolute on its face. To deny the contractor any opportunity of recovery

after he has completed his end of the bargain if he has persuaded the trier of fact that a statutory remedy is being invoked by a homeowner in bad faith would be to countenance a gross injustice and indeed to encourage its perpetuation and to assure its success." Id., 239–40.

Applying the bad faith exception in *Habetz*, this court upheld the judgment of the trial court with respect to a contractor's counterclaim for unpaid sums, despite the fact that the contract violated § 20-429 (a) by lacking a notice of cancellation provision—a defect that the trial court had deemed "minor." (Internal quotation marks omitted.) Id., 233–35. Although this court did not engage in a detailed discussion of what had constituted bad faith on the part of the homeowner,[9] it observed that the homeowner did not pay for numerous requested extras memorialized in change orders during the construction of an addition to his home, along with a portion of the balance remaining on the original contract, and that the homeowner had refused "repeated requests" by the contractor to sign the change orders with respect to the extras. Id., 233–34.

Rather than confine the bad faith exception to a limited array of homeowner conduct involving the knowing acceptance of services under a noncompliant agreement, I believe that case law from this court and the Appellate Court suggests that, consistent with its equitable and fact dependent nature, the bad faith exception is applicable to a wide variety of homeowner misconduct. First, in *Habetz* itself, the court suggested that the bad faith exception may have broad applicability. See id., 236 n.10 (interpreting *Barrett Builders* dictum "to mean that a homeowner cannot in bad faith invoke the contractor's statutory violation as a basis for his own repudiation of the contract," but leaving "for another day" question of "[w]hether proof of bad faith in some other manner on the part of the homeowner will also allow a contractor who has failed to comply with the requirements of the act to recover"). Indeed, *Habetz* focuses on the implied covenant of good faith and fair dealing; id., 238; which extends through the life of the contract. See *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 405–406, 142 A.3d 227 (2016). Consistent with the covenant, *Habetz* also focuses on the inequity of the homeowner's receipt of services without payment once the contractor has *completed* its "end of the bargain"—also an event that naturally extends beyond formation or acceptance. *Habetz* v. *Condon*, supra, 224 Conn. 240; see also *Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 681–82 and n.24, 657 A.2d 1087 (1995) (because bad faith exception only permits restitution, contractor who had not yet begun construction could not recover liquidated damages, even if homeowner acted in bad faith to repudiate defective contract). Thus, I agree with the Appellate Court's conclusion in the present case that a homeowner might

well have "invoked the act in bad faith if he did so to cover up and achieve the illicit objectives of other dishonest dealings between himself and the contractor, regardless of whether he knew of the act and its requirements at the time of those other dishonest dealings, or intended at the outset of those dealings to invoke the act to achieve his dishonest purpose." *Burns* v. *Adler*, supra, 158 Conn. App. 799.

I disagree with the defendant's position that *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 240, a companion case to *Habetz*, stands for the proposition that the bad faith exception is only applicable when the homeowner accepts services with knowledge of an "escape hatch" under the act. Consistent with the fact sensitive nature of the bad faith inquiry, I would confine *Wadia Enterprises, Inc.*, to the facts and claims before the court in that case, which held that a contractor's claim of bad faith could not survive summary judgment, despite the fact that the underlying defective contract was prepared by the homeowners' New York based attorney and architect, and the homeowners: (1) had certified payments while retaining 5 percent and refused to make the final payment in reliance on the terms of the contract that they sought to repudiate; (2) forced the contractor to "extend credit for change orders under provisions of the contract they [sought] to repudiate"; and (3) acted to "[enforce] the delay damages clause and alleged breach of specific parts of the very contract they [sought] to repudiate." Id., 248. This court held that "[n]one of these facts . . . indicates a dishonest purpose" sufficient to justify invocation of the bad faith exception, observing that the "fact that the [homeowners] had their architect and New York attorneys draft the contract does not in and of itself indicate bad faith on the part of the defendants. There is no allegation or proof that the attorneys intentionally omitted this requirement in order to have an escape hatch. At most, the New York attorneys were negligent in failing to consult Connecticut law and to include the required clause in the contract. An honest mistake does not rise to the level of bad faith." Id., 248–49. The court held that summary judgment was appropriate because these facts were not sufficient to sustain the necessary findings with respect to "motive, intent and good faith . . . ." Id., 250.

Our Appellate Court has followed *Wadia Enterprises, Inc.*, in rejecting claims of bad faith in cases wherein—at least in my view—the homeowners or their agents engaged in conduct that should place them beyond the protections of the act—at least by estoppel—such as actively participating in the drafting of the defective contract. See *Lucien* v. *McCormick Construction, LLC*, 122 Conn. App. 295, 302–303, 998 A.2d 250 (2010) (reversing finding of bad faith, despite "eleventh hour" invocation of act to avoid contract, which homeowner did not sign prior to work starting, because there

was no evidence that homeowner knew of violations or that her attorney "purposely drafted the contract in violation of the act in order to later avoid her obligation to pay"); id., 302 n.5 (noting that homeowner's attorney was based out of New York and would be charged with knowledge of act if admitted in Connecticut); *MacMillan* v. *Higgins*, supra, 76 Conn. App. 272 ("the fact that the [homeowners], through their agent, [a Connecticut attorney], drafted the contract does not mandate a finding of bad faith"); see also *Dinnis* v. *Roberts*, 35 Conn. App. 253, 256, 259, 644 A.2d 971 (recognizing footnote in *Habetz*, but declining to extend bad faith exception in upholding summary judgment for homeowners, despite contractor's claim that they acted in bad faith by terminating relationship when work was 85 percent complete, hiring engineer to inspect work without providing notice or expressing dissatisfaction, and using harassing litigation tactics), cert. denied, 231 Conn. 924, 648 A.2d 162 (1994).

I believe that *Wadia Enterprises, Inc.*, was wrongly decided, even beyond its apparent suggestion that the homeowner or their representative must harbor intent to draft a defective contract as an escape hatch in order for the bad faith exception to apply. *Wadia Enterprises, Inc.*, is inconsistent with both the bad faith exception and the purpose of the act, which is to protect consumers from unscrupulous contractors employing high pressure sales tactics and performing substandard work. *Habetz* v. *Condon*, supra, 224 Conn. 239. Thus, I hardly see how it is "responsive to demands of justice and good conscience"; id., 238; to allow a homeowner to repudiate a contract drafted by the homeowner, or especially the homeowner's professional representative such as an attorney or architect, based on technical defects in the contract. Allowing act based repudiation in such a case strikes me as just the kind of "inequitable reliance on statutes" contemplated by the bad faith exception. Id. Given the "strong" estoppel basis of the bad faith doctrine; id., 240; allowing a repudiation of a defective contract drafted by a homeowner's attorney or architect does nothing to further the legislative judgment to "impose the burden of compliance with the statute on the professional, the contractor, rather than on the nonprofessional, the consumer." *Barrett Builders* v. *Miller*, supra, 215 Conn. 326; see also *Wright Bros. Builders, Inc.* v. *Dowling*, 247 Conn. 218, 231, 720 A.2d 235 (1998) ("The [act] is a remedial statute that was enacted for the purpose of providing the public with a form of consumer protection against unscrupulous home improvement contractors. . . . The aim of the statute is to promote understanding on the part of consumers with respect to the terms of home improvement contracts and their right to cancel such contracts so as to allow them to make informed decisions when purchasing home improvement services." [Citation omitted.]).

I emphasize however, that even if I did not conclude that this court should overrule *Wadia Enterprises, Inc.*, because it was wrongly decided, I nevertheless do not read it as requiring intent at formation or acceptance to use the defective contract as an escape hatch to establish bad faith in *all* cases. Instead, I believe that *Wadia Enterprises, Inc.*, held only that the contractor failed to adduce sufficient evidence to prove that specific theory of bad faith in that particular case. To hold otherwise would be to read *Wadia Enterprises, Inc.*, as overruling—without saying so—the broader and equitable conception of bad faith articulated in its companion case, *Habetz*, which expressly left to "another day" other iterations of bad faith. *Habetz* v. *Condon*, supra, 224 Conn. 236 n.10. Rather, I believe that the intensely fact sensitive bad faith exception may encompass a broad variety of unscrupulous homeowner conduct. I find instructive *Walpole Woodworkers, Inc.* v. *Manning*, 126 Conn. App. 94, 101–102, 11 A.3d 165 (2011), aff'd, 307 Conn. 582, 57 A.3d 730 (2012), in which the Appellate Court upheld a finding of bad faith in a dispute arising from the construction of a fence in a case having nothing to do with the formation of the contract. The court held that an arbitrary refusal by the homeowner to pay was enough to support a finding of bad faith, given the fact finder's rejection of the homeowner's claim that the contractor's workmanship was defective. Id., 99–100. The Appellate Court observed specifically that, after the construction of a fence was "substantially completed," the homeowner had "delayed payment of the balance due [for more than six months] and, when pressed, revealed the existence of his small dog and his newly voiced concern about its escape. The defendant delayed the plaintiff's installation of a free fix for another six months because the parties could not agree on a date for the fix to be installed and could not agree that the balance would be paid upon completion. After the fix was installed, the defendant continued to refuse to pay the balance due, even though his only real concern about the work was addressed by the fix. Moreover, he testified at trial that the fence work was completed; he simply decided he would not pay the balance due on the contract." Id., 101–102.

The Appellate Court's decision in *Kronberg Bros., Inc.* v. *Steele*, 72 Conn. App. 53, 804 A.2d 239, cert. denied, 262 Conn. 912, 810 A.2d 277 (2002), similarly suggests that the bad faith inquiry is not limited to events surrounding the formation of the contract. Although the Appellate Court disagreed with the contractor's claim that the trial court had "improperly rejected its claim of bad faith by the [homeowners] on the basis of its finding that none of the acts alleged was committed prior to the execution of the contract"; id., 62; the court emphasized that, even with no evidence that the homeowners had contributed to the defect in

the contract, the trial court had "clearly considered the [homeowners'] acts *before and after* the execution of the contract when it rejected the [contractor's] bad faith claim," in concluding that the homeowners' actions alleged to constitute bad faith "arose out of the deteriorating relationship between the parties and can hardly be held to be actions in bad faith when the [homeowners] were confronted with what must have been an exasperating ordeal. The [contractor] overlooks the evidence in this trial, which hardly depicts a neat, orderly and efficient project proceeding on time and without delay." (Emphasis added; internal quotation marks omitted.) Id., 63.

Accordingly, I conclude that the Appellate Court properly determined that the bad faith exception is not limited to claims that the homeowner accepted services from the contractor intending to rely on a known defect in the contract to avoid payment.[10] See *Burns* v. *Adler*, supra, 158 Conn. App. 801. I agree with the Appellate Court that "[*a*]*ny* invocation of the act to avoid a contractual obligation to the contractor for a dishonest or sinister purpose can serve as a proper basis for seeking restitution under the bad faith exception, and thereby preventing an injustice." (Emphasis added.) Id.

### B

Relying heavily on evidence of the plaintiff's disorganized bookkeeping practices as part and parcel of his failure to comply with the act's documentation requirements, the majority further concludes that the defendant's conduct after he made a final payment on August 4, 2008, was not in bad faith because the trial court "made no finding, and the plaintiff has cited no evidence that would support a finding, that the defendant knew or should have known that the plaintiff's calculations of the amounts owed to him were correct, or even close to correct." The majority posits that "it is implicit in the trial court's factual findings that the plaintiff's noncompliance with the act gave rise to a genuine, good faith disagreement between the parties as to whether the defendant owed the plaintiff the amounts that the plaintiff claimed. Moreover, even if there were no genuine dispute about the value of the goods and services that the plaintiff actually provided, the plaintiff's failure to comply with the act deprived the defendant of the opportunity to make an informed decision as to whether he should continue to accept goods and services from the plaintiff during the course of the renovation project . . . ." The majority further emphasizes that the trial court "made no factual findings as to what items of work the plaintiff performed after [August 4, 2008], nor did it make any findings as to when the plaintiff billed the defendant for those items of work, and the plaintiff has cited no evidence that could provide the basis for such findings. Thus, there is simply no way of knowing whether the defendant believed in good faith that he

already had paid the plaintiff for the small amount of work that the plaintiff performed after August 4, 2008, and it clearly would not be in bad faith for the defendant to allow the plaintiff to finish work for which the defendant believed that he had already paid." (Footnote omitted.) I respectfully disagree with these conclusions because I believe that the majority's reliance on certain "implicit" findings represents an intrusion into the trial court's explicit factual findings.

I begin by noting that the majority's recitation of the governing principles is generally consistent with this court's statement of the law in *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 249—with which I agree in the abstract—that the homeowners' act of "initially enforcing the contract and subsequently asserting the contract's invalidity as a defense to a suit by the contractor . . . does not, by itself, present a claim of bad faith. There is nothing dishonest or sinister about homeowners proceeding on the assumption that there is a valid contract, enforcing its provisions, and later, in defense to a suit by the contractor, upon learning that the contract is invalid, then exercising their right to repudiate it." Indeed, I wholly agree with the majority's statement that the bad faith exception does not apply when the homeowner "repudiates the contract because the contractor's noncompliance with the act gave rise to a genuine, good faith dispute about the scope of the work or the contract price." See *Taylor* v. *King*, 121 Conn. App. 105, 125–27, 994 A.2d 330 (2010) (upholding trial court's rejection of contractor's bad faith claim because there was no evidence that contractor repeatedly and unsuccessfully asked homeowner to sign contract, there were multiple violations of § 20-429 [a] beyond lack of signed contract, and "the evidence in this case does not indicate that the plaintiff merely was seeking to avoid paying for the defendant's work but, rather, that the defendant's work was substandard and reduced the anticipated value of the house by approximately $100,000"); *New England Custom Concrete, LLC* v. *Carbone*, 102 Conn. App. 652, 661, 927 A.2d 333 (2007) (noting that trial court made no finding of fact with respect to contractor's bad faith claim and calling it "doubtful" that finding could be sustained when "[a]t best, the record demonstrates vigorous disagreement about the quality of the plaintiff's workmanship in performing the contract").

This statement of the law does not, however, alter the fundamentally factual nature of the bad faith inquiry; *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, supra, 281 Conn. 240; and the deference that the appellate courts owe the finder of fact under the applicable clearly erroneous standard of review, even when we disagree with the finding. See *MacMillan* v. *Higgins*, supra, 76 Conn. App. 271–72 (deferring to attorney trial referee's finding that homeowners had not acted in bad faith, despite fact that

they presented contractor with new contract one month after work had started, and that contract had been drafted by homeowner's attorney who was familiar with act, because referee could have credited attorney's testimony that original defective contract was merely draft). The "question before this court is not whether, if faced with the same set of facts, we would reach the same finding as did the [fact finder], but whether [his] finding of an absence of bad faith was clearly erroneous." Id., 271.

Turning to the facts in the present case, I agree with the Appellate Court's appropriately deferential treatment of the inferences drawn by the trial court in its rejection of the defendant's claim that "the alleged bad faith in this case involved nothing more than a homeowner's refusal to pay disputed charges arising from a contract dispute . . . ." *Burns* v. *Adler*, supra, 158 Conn. App. 803. In particular, the trial court "found, and the record confirms, that the renovation project on the defendant's home was largely completed by the time the defendant decided that he had paid the plaintiff enough for the work done on his home and refused to pay the plaintiff any more. The [trial] court found that the defendant's refusal to pay the plaintiff was motivated by the fact that the defendant had already received the bulk of the benefits he expected from his relationship with the plaintiff, and thus that there was little risk to him if he refused to pay. The [trial] court found that although the defendant had agreed to a time and materials contract,[11] he unilaterally and arbitrarily selected a price that he was willing to pay for the project without a sound factual basis. He then employed a carrot and stick approach to entice the plaintiff to continue to do work on the project, suggesting that he might be convinced to pay the plaintiff more, even though he never actually intended to do so. The [trial] court found that the defendant's conduct in asking the plaintiff to continue working on the project, knowing that he would not be paying the plaintiff for that work, constituted . . . neglect and/or a refusal to fulfill [his] contractual obligations to the plaintiff. The [trial] court concluded, based upon its observation of the conduct, demeanor and attitude of the witnesses—all factors that trial courts are particularly well-suited to assess—that [the defendant's] decision to make no further payments after August 4, 2008, was not prompted by an honest mistake as to his rights or duties. . . . [Rather], this decision was the product of [the defendant's] desire to use the plaintiff to finish the project at no further expense to [the defendant, which] was faster, more efficient and vastly more economical than concluding the relationship with the plaintiff and retaining a new contractor. Thus, it was a course of conduct that was the product of [himself] choosing to serve his own financial interests at the plaintiff's expense. The [trial] court concluded that the defendant's inducement of the plaintiff to con-

tinue working on his home on the pretense that he might pay him more, all the while not intending to do so, and his subsequent invocation of the act was made in bad faith." (Footnote added; internal quotation marks omitted.) Id., 804–805. Of particular import in my view is the trial court's factual finding that the defendant knew that the plaintiff's business was in grave peril because of unpaid subcontractors and suppliers in September, 2008, when he had expressed his intention not to make further payments, while exhorting the plaintiff to finish the punch list. I also find significant that the trial court rejected, as a factual matter, the defendant's claim that the "charges beyond the amount he chose to pay were unwarranted," given the defendant's expressed need for speed in completion, and the flurry of parties giving the plaintiff orders and incurring costs at the defendant's disinterested behest throughout the project.[12]

I agree with the Appellate Court that the trial court reasonably could have inferred that the defendant's conduct constituted bad faith, insofar as it was a "self-serving attempt by the homeowner to receive the benefit of a bargain for which he had freely contracted without fulfilling his own duty to pay for that benefit. He tried to avoid his obligation by hiding behind the protection of the act, which was not established for that purpose. The bad faith exception to the act has been recognized and enforced to discourage this very conduct." *Burns* v. *Adler*, supra, 158 Conn. App. 805. The majority's contrary reading of the factual record would have been logical and reasonable in the first instance if the majority had been tasked to serve as the fact finder. My view, however, is that the interpretation of the facts by the fact finder in this case does not lack "evidence in the record to support it," and I am not "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 225, 990 A.2d 326 (2010). I, therefore, agree with the Appellate Court that a conclusion to the contrary would be an impermissible substitution of our judgment for that of the trial court. *Burns* v. *Adler*, supra, 158 Conn. App. 805.

## II

I next address the plaintiff's certified appeal from the judgment of the Appellate Court affirming the trial court's denial of his motion for attorney's fees upon the foreclosure of a mechanic's lien pursuant to § 52-249 (a). See id., 808; see footnote 4 of this dissenting opinion. The Appellate Court's opinion aptly sets forth the following additional relevant facts and procedural history. "[P]rior to the commencement of trial in this action, the parties agreed that trial on the first count of the plaintiff's complaint, the count seeking foreclosure of his mechanic's lien on the defendant's property,

would be bifurcated from the trial on his breach of contract and unjust enrichment counts.[13] The court acquiesced and the case proceeded accordingly. After the court issued its memorandum of decision ruling in favor of the plaintiff under the bad faith exception to the act, the plaintiff moved for a supplemental judgment seeking foreclosure of the mechanic's lien. The parties thereafter stipulated that there would not be a hearing on the terms of the judgment of foreclosure of the mechanic's lien.[14] Accordingly, the stipulation was submitted to, and approved by, the court without a hearing. The trial court concluded, based upon the plain language of § 52-249 (a), that the condition precedent to the awarding of attorney's fees, namely, a hearing, had not been satisfied. The court thus denied the plaintiff's request for attorney's fees." (Footnotes added.) *Burns* v. *Adler*, supra, 158 Conn. App. 807–808. The Appellate Court agreed with the trial court's analysis. Id., 808.

On appeal, the plaintiff contends that the Appellate Court improperly concluded that the "hearing" requisite to the award of attorney's fees had not occurred because the terms of the foreclosure were determined by stipulation and in-chambers conferences, rather than in a hearing. The plaintiff argues that this approach is unworkable because it elevates "form over substance" by requiring the court to convene on the record for a very brief hearing. To this end, the plaintiff relies on *A. Secondino & Son, Inc.* v. *LoRicco*, 19 Conn. App. 8, 15–16, 561 A.2d 142 (1989), for the proposition that attorney's fees are allowed under § 52-249 (a) in foreclosure "actions," rather than just "hearings." He also contends that the requisite hearing commenced with trial on all other counts of the complaint, which served to establish the debt that formed the basis for the foreclosure judgment, given case law such as *Clem Martone Construction, LLC* v. *DePino*, 145 Conn. App. 316, 331–32, 77 A.3d 760, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013), which suggests that attorney's fees under § 52-249 (a) may include fees for the underlying trial to establish the debt.

In response, the defendant emphasizes that the proceedings in this case were bifurcated between the foreclosure and underlying unjust enrichment and breach of contract counts, and that the parties' subsequent stipulation resolving the plaintiff's motion for a supplemental judgment obviated the need for a hearing on the foreclosure remedy. Thus, the defendant contends that the plaintiff's "form over substance" arguments ask this court to rewrite the plain and unambiguous language of § 52-249 (a), which calls for a specific type of hearing as a prerequisite to an award of attorney's fees, namely, one to determine the form of the foreclosure judgment and the defendant's right of redemption; he posits that requiring the plaintiff to pay his own attorney's fees in the absence of such a hearing is consistent with the common-law American rule under

which parties pay their own attorney's fees absent a statutory or contractual exception. See, e.g., *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007). To this end, the defendant further contends that the stipulation did not have the formalities associated with a hearing. I agree with the defendant, and conclude that the requisite hearing did not occur in this case to permit an award of attorney's fees pursuant to § 52-249 (a).

Whether § 52-249 (a) permits an award of attorney's fees when the foreclosure judgment is the product of a stipulation rather than an on-the-record hearing "presents a question of statutory construction over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Tomick* v. *United Parcel Service, Inc.*, 324 Conn. 470, 477–78, A.3d (2016).

I am mindful that, "[i]n determining whether . . . a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Thus, [n]o statute is to be construed as altering the common law, farther than its words import [and a statute] is not to be construed as making any innovation upon the common law which it does not fairly express. . . . We recognize only those alterations of the common law that are clearly expressed in the language of the statute because the traditional principles of justice upon which the common law is founded should be perpetuated." (Citations omitted; internal quotation marks omitted.) *Ames* v. *Commissioner of Motor Vehicles*, 267 Conn. 524, 532, 839 A.2d 1250 (2004). It is well settled that this rule of strict construction applies to statutes such

as § 52-249 (a) allowing for awards of attorney's fees because such statutes operate in derogation of the "general rule of law known as the American rule," under which "attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, supra, 282 Conn. 582; see also, e.g., *Perry* v. *Perry*, 312 Conn. 600, 625, 95 A.3d 500 (2014); *Fennelly* v. *Norton*, 294 Conn. 484, 504 n.17, 985 A.2d 1026 (2010); *Ames* v. *Commissioner of Motor Vehicles*, supra, 532–33; *Stratford* v. *Castater*, 136 Conn. App. 535, 544–45, 46 A.3d 953 (2012).

As required by § 1-2z, I begin with the text of the statute. Section 52-249 (a) provides in relevant part: "The plaintiff in any action of foreclosure of a mortgage or lien, upon obtaining judgment of foreclosure, *when there has been a hearing as to the form of judgment or the limitation of time for redemption*, shall be allowed the same costs, *including a reasonable attorney's fee*, as if there had been a hearing on an issue of fact. . . ." (Emphasis added.) Given the strict construction that we must afford § 52-249 (a), I conclude that the Appellate Court properly upheld the trial court's denial of the plaintiff's request for attorney's fees because no hearing on the foreclosure remedy took place in the present case. Specifically, the parties stipulated during trial that the foreclosure and merits proceedings in the present case were to be bifurcated, and the conduct of the proceedings reflects this stipulation. Once the plaintiff had prevailed at the court trial, the foreclosure remedy was the product of a second stipulation resolving the plaintiff's motion for a supplemental judgment, rather than a judicial decision following an in-court proceeding.[15] This stipulated judgment procedure was inconsistent with the very specific language that the legislature used in drafting § 52-249 (a), which requires "a hearing as to the form of judgment or the limitation of time for redemption . . . ."[16] Allowing the stipulation to substitute for the required hearing,[17] as urged by the plaintiff, would run afoul of the maxim that "a court must construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . The intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature."[18] (Internal quotation marks omitted.) *Marciano* v. *Jimenez*, 324 Conn. 70, 77, 151 A.3d 1280 (2016).

I disagree with the plaintiff's argument that this interpretation of § 52-249 (a) leads to an unworkable result in contravention of § 1-2z because a defendant can avoid liability for attorney's fees by simply paying the debt

at the conclusion of the trial, rather than appealing it, thus obviating the need for a hearing to set the terms of the foreclosure judgment because the underlying debt would have been paid. The plaintiff argues that the "only way to avoid such an unjust result is to conclude that when trial commenced on all counts of the complaint, including establishing the debt which . . . was essential for the mechanic's lien foreclosure action, that the hearing mandated by . . . § 52-249 (a) commenced at that time." In my view, providing a judgment debtor with incentive to satisfy a debt immediately, rather than take an appeal or incur a judgment of foreclosure that would bring into play an attorney's fee award under § 52-249 (a), is not an unworkable result because it promotes the speedy resolution of disputes following the court's determination of the debt.[19] I, therefore, conclude that the Appellate Court properly upheld the trial court's denial of the plaintiff's request for attorney's fees.[20] *Burns* v. *Adler*, supra, 158 Conn. App. 808.

Because I would affirm the judgment of the Appellate Court, I respectfully dissent.

[1] I note that Amie R. Weitzman and the Salisbury Bank and Trust Company were also named as defendants in the present case. See footnote 1 of the majority opinion. In the interest of simplicity, I refer to Adler as the defendant in this opinion.

[2] General Statutes (Rev. to 2007) § 20-429 provides in relevant part: "(a) No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor and the contractor's registration number, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740, (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. Each change in the terms and conditions of a contract shall be in writing and shall be signed by the owner and contractor, except that the [Commissioner of Consumer Protection] may, by regulation, dispense with the necessity for complying with the requirement that each change in a home improvement contract shall be in writing and signed by the owner and contractor. . . .

"(f) Nothing in this section shall preclude a contractor who has complied with subdivisions (1), (2), (6), (7) and (8) of subsection (a) of this section from the recovery of payment for work performed based on the reasonable value of services which were requested by the owner, provided the court determines that it would be inequitable to deny such recovery."

I note that § 20-429 was amended subsequent to the events underlying the present case. See, e.g., Public Acts 2009, No. 09-18, § 2; see also footnote 2 of the majority opinion. All references to § 20-429 in this opinion are to the 2007 revision of the statute.

[3] I agree with part I of the majority opinion, which declines to reach, on preservation grounds, the defendant's claim that the 1993 enactment of § 20-429 (f) abrogated the judicially created bad faith exception.

[4] In contrast to the majority; see footnote 7 of the majority opinion; my resolution of the first certified appeal renders it necessary for me to reach the merits of the second certified appeal, which is limited to the following question: "Did the Appellate Court correctly affirm the judgment of the trial court denying the plaintiff's request for attorney's fees pursuant to General Statutes § 52-249 (a)?" *Burns* v. *Adler*, 319 Conn. 931, 932, 125 A.3d 206 (2015).

[5] General Statutes § 52-249 (a) provides: "The plaintiff in any action of foreclosure of a mortgage or lien, upon obtaining judgment of foreclosure, when there has been a hearing as to the form of judgment or the limitation of time for redemption, shall be allowed the same costs, including a reasonable attorney's fee, as if there had been a hearing on an issue of fact. The same costs and fees shall be recoverable as part of the judgment in any action

upon a bond which has been substituted for a mechanic's lien."

[6] I believe that the majority improperly characterizes the *entirety* of the defendant's claim in the first certified appeal as presenting a mixed question of fact and law subject to plenary review because it calls for us to consider whether the facts, which are undisputed for the purposes of the first certified appeal, "meet the legal standard of bad faith . . . ." In my view, this statement of the standard of review is overbroad insofar as a finding of bad faith often depends on those inferences reasonably drawn from otherwise undisputed historical facts with respect to matters such as an actor's motives and intent. See, e.g., *Wadia Enterprises, Inc.* v. *Hirschfeld*, supra, 224 Conn. 250. Put differently, to the extent that the trial court utilized the proper definition of the bad faith exception, I would adhere to existing precedent that would review the trial court's application of that doctrine under the clearly erroneous standard. See, e.g., *Walpole Woodworkers, Inc.* v. *Manning*, 126 Conn. App. 94, 99–102, 11 A.3d 165 (2011), aff'd, 307 Conn. 582, 57 A.3d 730 (2012); *MacMillan* v. *Higgins*, supra, 76 Conn. App. 271–73.

[7] The bad faith exception had its genesis in dictum in *Barrett Builders* v. *Miller*, supra, 215 Conn. 328–29, and its companion cases, *A. Secondino & Son, Inc.* v. *LoRicco*, 215 Conn. 336, 340, 576 A.2d 464 (1990), *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 350, 576 A.2d 149 (1990), and *Sidney* v. *DeVries*, 215 Conn. 350, 354, 575 A.2d 228 (1990) (per curiam).

[8] The court utilized "the standard definition of bad faith," which "in general implies both 'actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.' Black's Law Dictionary (5th Ed. 1979). Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz* v. *Condon*, supra, 224 Conn. 236–37.

[9] It appears that this court did not engage in a detailed discussion of the facts giving rise to the bad faith finding in *Habetz* because "any claims regarding the trial court's finding of bad faith on the part of the homeowner have been waived." *Habetz* v. *Condon*, supra, 224 Conn. 237 n.11.

[10] Given my conclusion that the bad faith exception is not limited to claims arising from formation or acceptance by the homeowner with knowledge of the defect, I similarly disagree with the defendant's corollary argument that the bad faith exception carries with it an element of loss causation. The loss that the bad faith exception seeks to remedy is caused by operation of the act's statutory preclusion on even quantum meruit recovery in cases of defective home improvement contracts. See *Habetz* v. *Condon*, supra, 224 Conn. 239. In my view, the court looks at the totality of the circumstances to determine whether the homeowner's hands are clean in invoking the substantial protections of the act, as compared to the more limited inquiry, urged by the defendant, of whether the homeowner actively used the act as a sword in an independently tortious scheme to defraud the contractor. See id., 239–40 (noting that bad faith exception is judicial creation doctrinally distinct from act, and embodies "the general principle . . . that an individual should not profit from his own deceptive and unscrupulous conduct").

[11] The trial court found specifically that the parties had entered into a time and materials contract, under which "the defendants would be charged $45 per hour for work done by the plaintiff and any crew members working under him," and that "the defendants would be responsible for any additional expenses on the project, including dumpsters and materials needed for the project." The trial court then found that the "plaintiff presented credible evidence, which the court does credit, indicating that the value of the plaintiff's work on the project, the value of the work of the crew members and subcontractors who worked under his supervision, and the cost of materials and associated expenses exceeds, not only the $985,000 paid by the defendants, but also the $214,039 in damages claimed in the complaint." The trial court reasonably could have credited the plaintiff's testimony that the constantly shifting nature of the project, with no final set of plans furnished to him by the defendant or his architect, rendered it impossible to create a fixed price contract. This also was consistent with the defendant's expressed demand for speed in completing the project.

[12] I disagree in particular with the majority's conclusion that, "even if there were no genuine dispute about the value of the goods and services that the plaintiff actually provided, the plaintiff's failure to comply with the act deprived the defendant of the opportunity to make an informed decision as to whether he should continue to accept goods and services from the plaintiff during the course of the renovation project . . . ." First, the trial court never made a finding to this effect. Second, beyond the trial court's

observation of the parties' demeanor and credibility during the proceedings, it is reasonable to infer that the trial court considered the unique circumstances of this project, under which the plaintiff had been working under extreme time pressure from the defendant to finish the job quickly, while taking orders from numerous individuals associated with the defendant, including his wife, her assistant, and their architect—despite "mushrooming" costs. In my view, this course of dealing evinced the defendant's implied waiver of his opportunity to make genuinely informed decisions. In my view, the majority's assignment of the risk of noncompliance with the act to the plaintiff under these factual circumstances is completely incompatible with the equitable nature of the bad faith exception.

[13] Because both parties had sought attorney's fees in their pleadings, the trial court agreed, for reasons of judicial economy, with their recommendation to bifurcate that issue, and conduct a subsequent evidentiary hearing only upon the court making an initial determination that a fee award is warranted. The trial court then agreed with the parties' joint recommendation, as stated by counsel for the plaintiff, to bifurcate the count of the complaint seeking foreclosure of the mechanic's lien on issues such as the value of the property and setting law days, if there were a finding that a debt is owed.

[14] The parties stipulated that: (1) a judgment may enter foreclosing the mechanic's lien on the defendant's home; (2) the debt due and payable pursuant to the mechanic's lien was $214,039.09, "the amount previously found by the [trial court] to be due"; (3) the fair market value of the defendant's improved real property subject to the lien was not less than $500,000; (4) a judgment of strict foreclosure was appropriate, with law days to commence on August 14, 2012; (5) the plaintiff was entitled to a title search fee of $225, but not an appraisal fee; and (6) "[w]hether [the] plaintiff is entitled to an award of attorney's fees on the [foreclosure count] of the revised complaint is subject to dispute between the parties . . . ."

With respect to the attorney's fees issue relative to the foreclosure count, the parties "agreed, subject to the court's approval, to submit . . . simultaneous briefs on this issue . . . ." The parties then stipulated that "the plaintiff has incurred reasonable attorney's fees in the total amount of $98,325 for all legal work in the [above captioned] case," as supported by attached time entries, which "may be considered by the court in considering the issue to be decided by the court pertinent to the attorney's fees, if any, that should be awarded on the [foreclosure count]. Although the parties agree that the plaintiff has incurred these fees, they do not agree as to whether he is entitled to recover fees in that amount, or any amount, as part of the judgment on the [foreclosure count]. Both parties reserve the right to submit briefs to the court regarding that issue, and to present oral argument if the court requests argument . . . ." The parties also stipulated that they would be available for oral argument, if desired by the court, on the attorney's fees issue.

The remainder of the stipulation concerned appellate issues, including the plaintiff's agreement not to seek to terminate the automatic appellate stay, collect the judgment, or foreclose the mechanic's lien while an appeal is pending. The parties also stipulated to an annual postjudgment interest rate of 4.5 percent.

[15] I recognize that the use of a stipulated judgment procedure in lieu of a hearing has salutary effects with respect to judicial economy, and that the plaintiff argues that it was "tantamount" to a hearing under § 52-249 (a) in the present case. Given the strict construction that we are required to give § 52-249 (a), I do not view the stipulation as having the formality requisite to a "hearing," as that word is understood as a legal term of art. See *State* v. *Fernando A.*, 294 Conn. 1, 16–17, 981 A.2d 427 (2009) (describing definitions of term " 'hearing' " in regular and legal dictionaries as encompassing judicial proceeding); *Willimantic Car Wash, Inc.* v. *Zoning Board of Appeals*, 247 Conn. 732, 737–38, 724 A.2d 1108 (1999) (relying on legal dictionary's definition of "hearing" as " '[a] proceeding of relative formality . . . generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and evidence presented, and in which parties to a dispute have a right to be heard" in concluding that pretrial conference was not "hearing" for court approval of settlement contemplated by General Statutes § 8-8n [footnote omitted; internal quotation marks omitted]).

[16] As the plaintiff urges, I recognize that the Appellate Court broadly stated in *A. Secondino & Son, Inc.* v. *LoRicco*, supra, 19 Conn. App. 15–16, that "§ 52-249 (a) succinctly and unambiguously provides for the allowance of attorney's fees in *actions* for foreclosure of mortgages or liens." (Emphasis

added; footnote omitted.) The plaintiff, however, takes that broadly stated language from the Appellate Court's opinion somewhat out of context, as that case did not involve a challenge to the procedure utilized in awarding attorney's fees, and did not involve a stipulation. Id., 15–16.

[17] The cases on which the plaintiff relies do not support his argument that the stipulation procedure utilized in this case satisfied the hearing requirement under § 52-249 (a), or that we have read that requirement in the "broadest possible terms rather than giving it the very narrow reading utilized by the Appellate Court and the trial court in this case." Although these cases upheld fee awards that appear to have encompassed both the foreclosure proceeding and the underlying trial, none of them concerned the propriety of a stipulation procedure in lieu of a hearing—none even mentioned the use of a stipulation, as all involved fee awards rendered after a hearing on the contractor's motion. See *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 181, 942 A.2d 1028 (2008) (bifurcated proceeding, with foreclosure judgment product of motion); *Clem Martone Construction, LLC* v. *DePino*, supra, 145 Conn. App. 331–32 (trial court improperly excluded legal work on homeowner's counterclaim in calculating fees for foreclosure claim); *Gagne* v. *Vaccaro*, 118 Conn. App. 367, 370–71, 984 A.2d 1084 (2009) (appellate attorney's fees permissible under § 52-249 [a]); *Original Grasso Construction Co.* v. *Shepherd*, 70 Conn. App. 404, 418–19, 799 A.2d 1083 (concluding that contractor did not waive claim for attorney's fees under § 52-249 [a] by failing to present evidence before attorney trial referee because that was question of law for court, and remanding case for hearing on motion for fees), cert. denied, 261 Conn. 932, 806 A.2d 1065 (2002).

[18] As the defendant points out, when the legislature has made attorney's fees more broadly available as a remedy in a civil action without mandating a particular procedure, it has said so. See, e.g., General Statutes § 35-53 (b) (providing that court "may award reasonable attorney's fees to the prevailing party" in case brought under Uniform Trade Secrets Act for wilful or malicious misappropriation); General Statutes § 42-110g (d) ("In any action brought by a person under [Connecticut Unfair Trade Practices Act], the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. In a class action in which there is no monetary recovery, but other relief is granted on behalf of a class, the court may award, to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorneys' fees.").

[19] As the plaintiff urges, I recognize that "[t]his court repeatedly has eschewed applying the law in such a hypertechnical manner so as to elevate form over substance." *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 34, 848 A.2d 418 (2004). I also recognize the public policy that supports promoting settlement of disputes. See, e.g., *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 166, 681 A.2d 293 (1996); *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 221 Conn. 194, 198, 602 A.2d 1011 (1992). Accordingly, I do not suggest that § 52-249 (a) precludes parties from settling foreclosure cases in a manner that specifically accommodates the hearing requirements of § 52-249 (a), or requires an extensive on-the-record proceeding. I similarly leave to another day the type of hearing necessary to satisfy the "specific aspects" of the foreclosure proceeding set forth in the plain language of § 52-249 (a).

[20] In his reply brief, the plaintiff posits that a decision by this court to affirm the judgment of the Appellate Court will result in a remand to the trial court for the purpose of setting new law days with respect to the judgment of strict foreclosure of the mechanic's lien. The plaintiff states that the hearing contemplated by § 52-249 (a) will take place at that time, and asks this court to determine whether he is—contrary to the conclusion of the trial court—entitled to attorney's fees for successfully prosecuting the underlying action, defending this appeal, and defending against the defendant's counterclaims, in addition to those fees relevant only to the foreclosure proceedings. Indeed, as the trial court noted in its memorandum of decision, there appears to be a Superior Court split on whether the attorney's fees awarded pursuant to § 52-249 (a) may encompass the trial of the underlying action, in addition to the foreclosure aspects of the proceeding—at least prior to the Appellate Court's decision in *Clem Martone Construction, LLC* v. *DePino*, supra, 145 Conn. App. 331–32. Given the majority's reversal of the judgment in favor of the plaintiff, this issue is not likely to arise on remand and I need not consider it further. See, e.g., *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 164 and n.8, 971 A.2d 676 (2009).