******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CONNECTICUT HOME HEALTH SERVICES, LLC
*v.* ANN FUTTERLEIB ET AL.
(AC 37766)

Beach, Mullins and Bishop, Js.*

*Argued November 15, 2016—officially released April 11, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Wiese, J.)

*Charles I. Miller*, for the appellant (substitute
defendant).

*A. Paul Spinella*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. This case concerns the enforceability of an alleged oral contract between a homemaker-companion agency and its clients. The defendants in this breach of contract action, Ann Futterleib and her husband Alfred Futterleib, appeal from the trial court's judgment partially in favor of the plaintiff, Connecticut Home Health Services, LLC, awarding $21,320.94 for caregiver services rendered by the plaintiff.[1] The defendants claim, inter alia, that the court: (1) erred in finding that they had acted in bad faith, and, therefore, that the plaintiff's failure to comply with statutory requirements regarding home companion-care agencies was excused; and (2) erred in rendering judgment on an oral contract because chapter 400o of the General Statutes, entitled "Homemaker-Companion Agencies" (Homemaker-Companion Agencies Act), specifically, General Statutes (Rev. to 2010) § 20-679,[2] requires that this type of contract be in writing.[3] We reverse in part the judgment of the trial court.

The record reveals the following facts and procedural history. The plaintiff, doing business as Right at Home, is a homemaker-companion agency that provides in-home care and assistance to elderly and/or disabled people. Caregivers provide a variety of services for clients, including cooking, light housekeeping, and medication assistance. In January or February, 2010, Robert Hendrickson, the defendants' power of attorney, sought out the plaintiff to provide care for the defendants, his mother and step-father, both of whom were suffering from physical ailments. On February 13, 2010, representatives of the plaintiff company, Hendrickson, and the defendants met at the defendants' home to discuss the defendants' needs for live-in, twenty-four hour care at the cost of $230 per live-in shift. The parties did not create or execute any contract or written understanding of agreement at that meeting. The defendants' live-in caregiver, an employee of the plaintiff, started work that afternoon at the defendants' home.

The plaintiff's general business practice is to prepare a client service agreement after an assessment meeting and then to send it to the client, or their representative, to sign and return. Sometime around March 23, 2010, Hendrickson received at his home address a client Services Agreement that had been signed by the plaintiff's president on March 20, 2010 (service agreement). Hendrickson did not sign the agreement, and he did not send it back to the plaintiff. The plaintiff, through the live-in caregiver, continued to provide care to the defendants, and Hendrickson paid for the services on a periodic basis. After some time, the payments for the defendants' care became delinquent and the business relationship ended on January 27, 2012.[4] Hendrickson made three payments toward the balance owed after the relationship ended. The plaintiff filed this action on

March 13, 2013, and at that time, the balance allegedly owed by the defendants was $21,320.94.

In its original four count complaint, the plaintiff alleged two counts of breach of a written contract on the basis of the service agreement, with one count based specifically on Hendrickson's actions, unjust enrichment, and tortious interference with a business relationship. In this complaint, the plaintiff cited Hendrickson as a defendant along with Ann Futterleib and Alfred Futterleib, and sought to recover the balance owed by the defendants as well as additional damages. On March 25, 2014, the plaintiff filed a motion to amend its complaint to remove Hendrickson as a defendant and remove any mention of the service agreement in its breach of contract count. The court granted this motion on April 3, 2014. In its three count amended complaint,[5] the plaintiff alleged: (1) breach of an oral contract; (2) unjust enrichment; and (3) tortious interference with employment relations. The defendants filed an amended answer on April 10, 2014, and alleged as special defenses that: (1) the plaintiff committed an unfair or deceptive practice by failing to meet statutory requirements to register its trade name; (2) the plaintiff's claims were barred by the doctrine of unclean hands because it failed to register its trade name and also because the plaintiff intentionally forged Hendrickson's signature onto the purported service agreement;[6] (3) the plaintiff's claims premised on an oral contract and unjust enrichment were barred by § 20-679 and General Statutes § 42-135a, a section of the Home Solicitation Sales Act; and (4) the plaintiff's claim based on oral contract was barred by General Statutes § 52-550, the statute of frauds.

The four day trial to the court took place between April 3 and April 8, 2014. In its December 31, 2014 memorandum of decision, the court, *Wiese, J.*, found that the parties had entered into an oral contract on February 13, 2010, because they "verbally agreed to the daily rate of the caregiver and . . . a Client Services Agreement would be prepared and mailed to the defendants for their approval and signature." The court found for the defendants on the plaintiff's tortious interference claim and, because the court found in favor of the plaintiff on its oral contract claim, it did not address the unjust enrichment claim. As for the defendants' special defense that the plaintiff's claims were barred by §§ 20-679 and 42-135a, the court found that the service agreement "was intentionally not returned to [the plaintiff]. It was left in an envelope by Mr. Hendrickson and he declined to take any action with regards to it. Through inadvertence, [the plaintiff] did not become aware of this fact at the time that services were provided to [the defendants]." The court further found that Hendrickson's intentional failure to sign and return the service agreement constituted bad faith, which excused the plaintiff's noncompliance with the statutory require-

ment that the contract of service be in writing. As noted, the court rendered judgment for the plaintiff in the amount of $21,320.94. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We first set forth the legal principles relevant to the claims at issue. At the time of the conduct in question, § 20-679, which governs contracts between homemaker-companion agencies and clients, provided in relevant part: "Not later than seven calendar days after the date on which a homemaker-companion agency commences providing homemaker services or companion services, such agency shall provide the person who receives the services, or the authorized representative of such person, with a written contract or service plan that prescribes the anticipated scope, type, frequency, duration and cost of the services provided by the agency. . . ." General Statutes (Rev. to 2010) § 20-679. In addition, the statute required that the contract or service plan provide notice to the person receiving services: "(1) of the person's right to request changes to, or review of the contract or service plan, (2) of the employees of such agency who, pursuant to section 20-678 are required to submit to a comprehensive background check, and (3) that such agency's records are available for inspection or audit by the Department of Consumer Protection. . . ." General Statutes (Rev. to 2010) § 20-679. The statute further provided that "[n]o contract or service plan for the provision of homemaker or companion services shall be valid against the person who receives the services or the authorized representative of such person, unless the contract or service plan has been signed by a duly authorized representative of the homemaker-companion agency and the person who receives the services or the authorized representative of such person. . . ."General Statutes (Rev. to 2010) § 20-679.[7]

With these legal principles in mind, we turn now to our assessment of the defendants' claims on appeal.

I

The defendants first claim that the court erred in finding that Hendrickson acted in bad faith by not signing and returning the service agreement, and, therefore, that the plaintiff's noncompliance with § 20-679 was excused.[8] We assume, without deciding, that the court correctly incorporated a bad faith exception into the Homemaker-Companion Agencies Act because, even if the trial court was correct in its bad faith imputation, the record does not support a finding that Hendrickson acted in bad faith.

The following additional facts and procedural history are relevant to our resolution of this claim. As noted, the defendants, Hendrickson, and representatives of the plaintiff company met at the defendants' home on

February 13, 2010, to discuss the defendants' care needs, and later that day, the plaintiff's employee, a live-in caregiver, began working at the defendants' home. More than one month later, sometime between March 23 and March 25, 2010, Hendrickson received in the mail a one page service agreement from the plaintiff. That agreement provided information about the cost of services ($230 per day), holiday procedures, mileage reimbursement, scheduling, billing, indemnity, and insurance. The agreement also provided a damages clause dealing with the consequences that would ensue in the event that a client directly hires the plaintiff's caregiver, as well as an authorization to release the client's medical information to specific entities for insurance, accreditation, and/or medical purposes.

Hendrickson did not sign or return the service agreement to the plaintiff. When asked at trial what he did with the document, he testified that he "actually forgot all about it" and that he "left it in the envelope" and "never really dug it out again." He further testified that he was not contacted by the plaintiff about the service agreement after that. The vice president of the plaintiff company, Robert Scandura, who was present at the initial February 13, 2010 meeting, testified that "*some families* who try to be deceitful . . . don't send [the service agreement] back." (Emphasis added.) He also testified that Hendrickson "withheld [the service agreement] intentionally," and that "[Hendrickson's family] chose not to sign [the service agreement] . . . ." No evidence was presented in support of Scandura's testimony regarding Hendrickson's allegedly nefarious motive. For the first time in our jurisdiction, the court imputed onto the Homemaker-Companion Agencies Act a bad faith exception to statutory compliance, borrowed from the Home Improvement Act, General Statutes § 20-418 et seq. With that imputation in mind, the court then found that Hendrickson had acted in bad faith by intentionally failing to sign and return the service agreement, and, therefore, the plaintiff's noncompliance with § 20-679 was excused.

"Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010).[9] The statutory language of the Home Improvement Act does not provide a bad faith exception to compliance with the act, but our courts have incorporated such an exception into the statute. This exception excuses a contractor's noncompliance with the act if the contractor's failure to comply was caused by the other party's bad faith. See *Habetz* v. *Condon*, 224 Conn. 231, 238, 618 A.2d 501 (1992) ("a contractor, otherwise precluded from recovering moneys owed for his work because of a violation of the act, must be permitted to assert that the homeowner's bad faith precludes him from safely repudiating the contract and hiding behind the act in order to bar the

contractor's recovery"); *Andy's Oil Service, Inc.* v. *Hobbs*, 125 Conn. App. 708, 715, 9 A.3d 433 (2010) ("Although [the Home Improvement Act] generally prohibits a plaintiff from pursuing a claim . . . on a home improvement contract if the act's requirements are not satisfied, proof of bad faith on the part of the homeowner is an exception to this restriction. . . . The bad faith exception precludes the homeowner from hiding behind the protection of the act. . . . The central element giving rise to this exception is the recognition that to allow the homeowner who acted in bad faith to repudiate the contract and hide behind the act would be to allow him to benefit from his own wrong, and indeed encourage him to act thusly." [Citations omitted; internal quotation marks omitted.]), cert. denied, 300 Conn. 928, 16 A.3d 703 (2011).

Our Supreme Court, in analyzing the bad faith exception to the Home Improvement Act, has stated: "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . *Bad faith means more than mere negligence; it involves a dishonest purpose.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Habetz* v. *Condon*, supra, 224 Conn. 237. In *Habetz*, a plaintiff homeowner sued a defendant contractor for breach of contract and the defendant counterclaimed for money owed on the additional work under a subsequent agreement that was never signed by the plaintiff, despite the defendant's repeated requests that he do so. Id., 233–34. The plaintiff asserted the defendant's noncompliance with the Home Improvement Act, namely, that there was not a signed contract, as a defense to recovery. Id., 234. Our Supreme Court affirmed the trial court's finding that the plaintiff's bad faith in not signing the contract excused the defendant's "minor noncompliance" with the Home Improvement Act. (Internal quotation marks omitted.) Id., 235, 240.

In *Taylor* v. *King*, 121 Conn. App. 105, 127, 994 A.2d 330 (2010), however, this court distinguished *Habetz* and affirmed a trial court's finding there was no bad faith where the plaintiff's failure to sign the contract was not the only example of the defendant's noncompliance with the Home Improvement Act. In *Taylor*, the plaintiff homeowner and the defendant contractor entered into an agreement for a renovation project at the plaintiff's home, though neither party signed a written contract. Id., 122, 125. In the complaint, the plaintiff alleged that the defendant's conduct violated the Home Improvement Act because the contract was not signed, it did not contain the whole agreement between the parties, and it did not contain a notice of the plaintiff's right to cancel the contract. *Taylor* v. *King*, Superior Court,

judicial district of New London, Docket No. CV-075002674, 2008 WL 4515937, *9 and n.13 (September 24, 2008). The trial court found that the defendant failed to comply with the Home Improvement Act. Id., *11. On appeal, the defendant, relying on *Habetz*, argued that the plaintiff had acted in bad faith by claiming noncompliance with the Home Improvement Act, because he had not signed the contract. *Taylor* v. *King*, supra, 125–26. In disagreeing with the defendant, and distinguishing *Habetz*, a panel of this court stated: "[T]he defendant's noncompliance with the act was not merely the failure to have a signed contract. In this case, the defendant did not comply with several other portions of [the Home Improvement Act]. Also, there is no evidence that he ever asked the plaintiff about signing the contract after he gave it to him initially. . . . The fact that the plaintiff did not sign the contract is not a sufficient basis for us to conclude that the court improperly failed to find that the plaintiff claimed [noncompliance with] the act in bad faith." Id., 127.

In the present case, assuming, without deciding, that the court was correct in grafting the Home Improvement Act's bad faith exception onto the Homemaker-Companion Agencies Act, we must determine whether the court erred in determining that Hendrickson had acted in bad faith by not signing and returning the service agreement to the plaintiff. The defendants argue that the court erred in making that determination. We agree. There was no direct evidence in the record to support a finding that Hendrickson's failure to sign the contract was done in bad faith, and the plaintiff's claim to the contrary, without corroboration, does not constitute sufficient evidence. Therefore, we do not believe the evidentiary record supports the conclusion that the plaintiff's noncompliance with § 20-679 should be excused, and the court's finding to the contrary was a clear error.

Hendrickson testified at trial that he simply put the agreement aside and forgot about it. The court heard no evidence that Hendrickson intentionally had not signed the agreement except for Scandura's testimony that "*some families* who try to be deceitful . . . don't send [the service agreement] back," and his unsupported claim that Hendrickson "withheld [the service agreement] intentionally . . . ." (Emphasis added.) Although testimony, at times, may be sufficient to uphold a factual determination, this testimony about Hendrickson's state of mind is nothing more than unsupported speculation. Therefore, the evidence does not support the court's finding that Hendrickson acted fraudulently, with "a design to mislead or deceive" the plaintiff, with an "interested or sinister motive," or with a "dishonest purpose." (Internal quotation marks omitted.) *Habetz* v. *Condon*, supra, 224 Conn. 237. In fact, the only direct evidence on this issue better supported the argument that Hendrickson merely acted negli-

gently in forgetting to sign the agreement, which our Supreme Court has determined is insufficient proof of bad faith conduct. Id. Hendrickson also testified, without contradiction, that the plaintiff never reminded him to return the signed agreement.

In addition, the fact that the service agreement was unsigned by the defendants was not its only deficiency. It failed to conform to most of the requirements set forth in § 20-679. The service agreement was silent as to the scope, type, frequency, or duration of the services that were to be provided to the defendants, the inclusion of which is required under § 20-679. The service agreement also did not provide notice of the client's "right to request changes to, or review of the contract or service plan," or that the plaintiff's employees "are required to submit to a comprehensive background check," or that the plaintiff's "records are available for inspection or audit by the Department of Consumer Protection,"[10] the inclusion of which is also required under General Statutes (Rev. to 2010) § 20-679. The service agreement complied only with the requirement that it provide the cost of service.[11] Additionally, the statute requires that the service agreement be provided to the client within seven days of the commencement of service. The defendants' live-in caregiver started on February 13, 2010, and Hendrickson did not receive the agreement until March 23, 2010, at the earliest, which is far beyond the seven day statutory requirement.[12] In short, even if this purported agreement had been signed by the parties, it would have been of doubtful enforceability in light of its many omissions and shortcomings.

On the basis of our holding in *Taylor* that a consumer's failure to sign a contract, by itself, does not constitute bad faith when the contract failed to comply with other provisions of the Home Improvement Act, we conclude that the plaintiff's failure to comply with § 20-679 here cannot be excused by the defendants' failure to sign the service agreement. See *Taylor* v. *King*, supra, 121 Conn. App. 127. Accordingly, the court's finding that Hendrickson had acted in bad faith, and as a result, that the plaintiff's noncompliance with the Homemaker-Companion Agencies Act was excused, is clearly erroneous.

II

Having determined that the service agreement, executed by the plaintiff but not the defendants, for the provision of home care services to the defendants by the plaintiff was unenforceable, we next turn to the court's determination that the parties had entered into an enforceable oral contract. The defendants argue that the court erred in rendering judgment upon an oral contract because the Homemaker-Companion Agencies Act, specifically, § 20-679, requires that a contract of this type be in writing.[13] The plaintiff argues that the trial court correctly found that the parties entered into

an oral contract, and that the defendants were liable for the unpaid balance of the services rendered by the plaintiff. This issue of whether § 20-679 requires that contracts between homemaker-companion agencies and its clients be in writing, and, therefore, whether oral contracts of this type are unenforceable as a matter of law, has yet to be decided in our jurisdiction, and after a thorough inquiry, we agree with the defendants.[14]

As noted, the court, in its memorandum of decision, found that the parties had entered into an oral agreement and stated: "[T]he plaintiff and the defendants met [on February 13, 2010] to discuss establishing home care to the defendants. Both parties verbally agreed to the daily rate of the caregiver and the client service plan was prepared as a result of the meeting. It was also agreed that a client Services Agreement would be prepared and mailed to the defendants for their approval and signature. The court finds that, at this point, the parties had an established . . . oral agreement."

We first set forth our standard of review and the relevant legal principles that guide our analysis of this aspect of the appeal. The determination of the requirements of the Homemaker-Companion Agencies Act is a matter of statutory construction, and, therefore, we apply a plenary standard of review on appeal, as the issue is one of law. See *Wright Bros. Building, Inc.* v. *Dowling*, 247 Conn. 218, 226, 720 A.2d 235 (1998). When construing a statute, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 676, 657 A.2d 1087 (1995). "It has often been said that the legislative intent is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . Where the language used is clear and unambiguous, we will not speculate as to some supposed intention." (Citations omitted; internal quotation marks omitted.) *Caulkins* v. *Petrillo*, 200 Conn. 713, 716–17, 513 A.2d 43 (1986). "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." General Statutes § 1-1 (a).

Contracts for the provision of home care services are governed by § 20-679 of the Homemaker-Companion Agencies Act, which is titled: "*Written Contracts or service plans*. Requirements." (Emphasis added.) General Statutes (Rev. to 2010) § 20-679. The statute provides in relevant part that "[n]ot later than seven calendar days after the date on which a homemaker-

companion agency commences providing homemaker services or companion services, such agency *shall provide the person who receives the services, or the authorized representative of such person, with a written contract or service plan* that prescribes the anticipated scope, type, frequency, duration and cost of the services provided by the agency. . . . *No contract or service plan for the provision of homemaker or companion services shall be valid against the person who receives the services or the authorized representative of such person, unless the contract or service plan has been signed* by a duly authorized representative of the homemaker-companion agency and the person who receives the services or the authorized representative of such person. . . ." (Emphasis added.) General Statutes (Rev. to 2010) § 20-679.[15]

The language of § 20-679 is clear and unambiguous. "The use of the word 'no' in the statute is self-explanatory. In this instance, the use of the word 'shall' by the legislature connotes that the performance of the statutory requirements is mandatory rather than permissive. See, e.g., *Hossan* v. *Hudiakoff*, 178 Conn. 381, 383, 423 A.2d 108 (1979); *Akin* v. *Norwalk*, 163 Conn. 68, 74, 301 A.2d 258 (1972). . . . 'Valid' is defined by Webster's New International Dictionary as, 'having legal strength or force . . . .' " (Citations omitted.) *Caulkins* v. *Petrillo*, supra, 200 Conn. 717; see also id., 720 (holding that language of General Statutes [Rev. to 1980] § 20-429 [a] of Home Improvement Act, "[n]o home improvement contract shall be valid unless it is in writing," requires that contractor provide written contract). Therefore, read literally, it is clear that the plain language of the Homemaker-Companion Agencies Act does not provide an exception to the requirement that home care contracts be in writing. See id.

It is apparent that the legislature passed the Homemaker-Companion Agencies Act for the protection of the public, particularly the elderly, and that the remedial purposes of the statute would be undermined if we were to permit a homemaker-companion agency to enforce an oral contract. The purpose and clear intent of § 20-679 would be thwarted by permitting a homemaker agency to bring an action against a client for services rendered based solely on an oral agreement and in the absence of a written contract including the statutorily mandated notices and protections. To do so would emasculate the prescriptions and proscriptions of the Homemaker-Companion Agencies Act.[16] As noted, § 20-679 requires that a contract for home care services between a homemaker-companion agency and a client, or the client's representative, be in writing. Therefore, the court's determination that the parties' oral contract for services was enforceable was legally erroneous.

The judgment is reversed in part and the case is remanded to the trial court with direction to render

judgment in favor of the defendants on count one of the complaint. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

1 Robert Hendrickson, administrator of the estates of Ann Futterleib and Alfred Futterleib, filed in this court and in the trial court motions to intervene as a defendant in place of both Ann Futterleib and Alfred Futterleib. This court treated that motion as a motion to substitute and granted it. For purposes of clarity, we refer to Ann Futterleib and Alfred Futterleib as the defendants, and to Hendrickson individually by name.

2 General Statutes (Rev. to 2010) § 20-679 has since been amended by No. 13-88, § 2, of the 2013 Public Acts, in a manner not pertinent to our assessment of the issues presented in this appeal. Unless otherwise indicated, all references in this opinion to § 20-679 are to the 2010 revision of the statute.

3 The defendants also claim that the court abused its discretion by allowing the plaintiff to amend its complaint at the commencement of trial. Because we reverse in part the judgment of the trial court on other grounds, we need not reach this claim. Therefore, for purposes of our analysis, we treat the amended complaint as operative.

4 It is undisputed that the defendants privately hired their live-in caregiver once their relationship with the plaintiff had ended. The record is unclear, though, as to whether the caregiver was fired by the plaintiff and then hired by the defendants, or whether she left the plaintiff's employ in order to work for the defendants. The plaintiff alleged in its amended complaint that the defendants tortiously interfered with the employment agreement by hiring away the caregiver from its employ. The court found that the plaintiff did not meet its burden in proving this cause of action. The plaintiff did not appeal this finding.

5 Because the plaintiff removed Hendrickson as a defendant in the amended complaint, the breach of contract claim that dealt specifically with Hendrickson's actions was removed as well.

6 The court determined that the doctrine of unclean hands did not apply to the plaintiff's claims because the defendants did not prove that the plaintiff had forged Hendrickson's signature on the service agreement. The defendants claim on appeal that the court erred "in applying the equitable defense of unclean hands to the plaintiff's legal claims" as opposed to its equitable claims, and in "failing to apply the applicable legal standard and elements regarding forgery." Both arguments are directed at the allegedly forged signature on the service agreement, and its resultant unenforceability. Because the plaintiff's amended complaint proceeded solely on a claim for breach of an oral contract, these claims are not applicable, and we will not address them.

7 In addition, § 20-670-3 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "A written contract or service plan shall be provided by the agency to the client . . . [and the] agency shall not enforce the written contract or service plan unless it is signed by both the agency and client." Subsection (b) provides that "[w]ritten contracts or service plans shall: (1) provide a list of the anticipated services to be provided by the agency to the client, the term and cost of said services, a clear definition of the employee, provider and client employment relationship, safeguards for securing personal client information, a list of provider job categories such as 'live-in' or 'daily call,' and job duties; (2) contain the homemaker-companion agency policy for the acceptance of gratuities and gifts by the homemaker-companion agency's employees and independent contractors on behalf of the client; and (3) contain a process for the client to file a complaint with the homemaker-companion agency. A process shall be made available for individuals other than a client to file a complaint." Regs., Conn. State Agencies § 20-670-3 (b).

8 We note that although Hendrickson was removed as a defendant, his actions can still be imputed to the defendants. "A written power of attorney constitutes a formal contract of agency that creates a principal-agent relationship." *Bank of Montreal* v. *Gallo*, 3 Conn. App. 268, 273, 487 A.2d 1101 (1985). A principal generally is bound by an agent's bad faith. See *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 240, 654 A.2d 342 (1995); *Johnson* v. *Smith*, 21 Conn. 626, 633 (1852). The court found that "the defendants' conduct would fall under the bad faith exception" by virtue of the actions of their agent, Hendrickson.

[9] We recognize that our Supreme Court recently has concluded, in *Burns* v. *Adler*, 325 Conn. 14, 33,    A.3d    (2017), that "whether undisputed facts meet the legal standard of bad faith is a question of law." This new standard of review is not applicable to the case here, though, because the record does not support the court's factual conclusion regarding Hendrickson's behavior. Therefore, the court's determination as to Hendrickson's alleged bad faith is subject to the well established clearly erroneous standard of review.

[10] Paragraph 14 of the service agreement does notify the clients that they authorize the release of their medical information, but it does not go so far as to say that the *Department of Consumer Protection* may inspect or audit the plaintiff's records.

[11] The service agreement also failed to comport with almost every requirement under § 20-670-3 except that it provided the cost of service and the notation that the caregiver would be " 'live-in.' " Regs., Conn. State Agencies § 20-670-3 (b); see footnote 7 of this opinion.

[12] In its memorandum of decision, the court excused this delay because "the defendants never objected to receiving the client Services Agreement beyond the seven day period. Instead, the defendants continued to accept services from the plaintiff." Though the delay in sending the agreement is not dispositive of the issue here, because the plaintiff failed to comply with almost every other statutory provision, we note that "the legislature is entitled . . . to impose the burden of compliance with the statute on the professional, [the homemaker-companion agency], rather than on the non-professional, [the client]." (Internal quotation marks omitted.) *Habetz* v. *Condon*, supra, 224 Conn. 239.

[13] As an alternative argument, the defendants claim that the enforcement of an oral contract is barred by the Home Solicitation Sales Act pursuant to § 42-135a. Because we agree with the defendants' principal contention, we need not reach this argument.

[14] We note that the defendants do not claim that the plaintiff is barred from enforcing the alleged contract because the contents of the February 13, 2010 meeting failed to conform to the statutory requirements. They argue that, as a matter of law, an oral contract of this type is unenforceable because the statute requires that it be written.

[15] Similarly, § 20-670-3 (a) of the Regulations of Connecticut State Agencies mandates that a homemaker-companion agency provide a "*written contract or service plan* . . . to the client . . . [and the] agency shall not enforce the written contract or service plan unless it is signed by both the agency and client." (Emphasis added.)

[16] In regards to the plaintiff's unjust enrichment claim, the court stated: "Assuming, arguendo, even if the contract between the defendants and the plaintiff was unenforceable, the plaintiff would still be able to recover through its unjust enrichment claim due to the defendants' bad faith. See *Andy's Oil Service, Inc.* v. *Hobbs*, supra, 125 Conn. App. 715 ('[a]lthough [the Home Improvement Act] generally prohibits a plaintiff from pursuing a claim for unjust enrichment on a home improvement contract if the act's requirements are not satisfied, proof of bad faith on the part of the home-owner is an exception to this restriction'). Because the court is ruling that there was a contract between these parties, it is unnecessary to address the plaintiff's unjust enrichment claim." Where a contract is unenforceable because it fails to conform to a statutory requirement that it be in writing, there can be no recovery under quasi-contractual claims, such as unjust enrichment, absent proof of bad faith on the part of the other party. See *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 350, 576 A.2d 149 (1990) ("absent proof of bad faith on the part of the homeowner, [the Home Improvement Act] permits no recovery in quasi contract by a contractor who has failed to comply with the statute's written contract requirement"). Because we hold that a contract pursuant to § 20-679 must be in writing, and that the court erred in finding that Hendrickson's alleged bad faith excused the service agreement's noncompliance with § 20-679, the plaintiff would not be able to recover on its unjust enrichment claim.